1

2           **UNITED STATES DISTRICT COURT**

3              **DISTRICT OF NEVADA**

4 AAAA Investments, LLC,           Case No. 2:24-cv-01002-CDS-MDC

5          Plaintiff        **Order Approving Stipulation,**

                      **Denying Plaintiff's Motion for**

6 v.                  **Summary Judgment, and Granting**

                      **in Part and Denying in Part**

7 Twin City Fire Insurance Company,     **Defendant's Motion for Summary**

                          **Judgment**

8          Defendant

                      [ECF Nos. 19, 22, 23]

9

10       This is an insurance dispute between plaintiff AAAA Investments, LLC and defendant

11 Twin City Fire Insurance Company in which AAAA seeks recovery for breach of contract and

12 several other related claims arising out of a building insurance policy. Am. compl., ECF No. 1-3 at

13 9–18. The parties submitted joint stipulated undisputed facts. ECF No. 19. Shortly thereafter,

14 AAAA moved for partial summary judgment on the limited issue of coverage (ECF No. 22)[1] and

15 Twin City moved for summary judgment (ECF No. 23).[2] As set forth in this order, I approve the

16 stipulation, find that the insurance contract is not ambiguous, but also find that there is still a

17 genuine dispute of material fact about whether the property was "under construction or

18 renovation," AAAA's motion is denied and Twin City's motion is granted in part and denied in

19 part.

20 **I.**    **Background**

21       The parties' joint stipulated undisputed facts lay the foundational facts of this case.[3]

22 Twin City issued to AAAA an insurance policy on AAAA's building located at 5889 E. Lake

23 Mead Boulevard, Las Vegas, Nevada 89156. ECF No. 19 at 3–4. The contract's special property

24 coverage form included the following terms:

25

26 ───────────────────

[1] This motion is fully briefed. *See* Opp'n, ECF No. 24; Reply, ECF No.27.

[2] This motion is fully briefed. *See* Opp'n, ECF No. 25; Reply, ECF No. 26.

[3] As noted above, the parties' joint stipulation at ECF No. 19 is approved.

A.  COVERAGE

We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

1.  **Covered Property**

    Covered Property as used in this policy, means the following types of property for which a Limit of Insurance is shown in the Declarations:

    a.  **Buildings**, meaning only building(s) and structure(s) described in the Declarations, including:

        (1)  Completed additions;

        (2)  Permanently installed:

            (a) Fixtures;

            (b) Machinery; and

            (c) Equipment;

        (3)  Outdoor fixtures;

        (4)  Your personal property in apartments, rooms or common areas furnished by you as landlord;

        (5)  Building Glass, meaning glass that is part of a building or structure;

        (6)  Personal property owned by you that is used to maintain or service the buildings or structures on the premises, including:

            (a) Fire extinguishing equipment;

            (b) Outdoor furniture;

            (c) Floor coverings; and

            (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering; and

(7) If not covered by other insurance;

    (a) Additions under construction, alterations and repairs to the buildings or structures;

. . .

**2.  Property Not Covered**

Covered Property does not include:

. . .

f.  Outdoor fences, radio or television antennas (including satellite dishes), including their lead in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other then those held for sale or sold but not delivered), except as any of these may be provided in the:

    (1)  Outdoor Property Coverage Extension; or

    (2) Outdoor Signs Optional Coverage;

. . .

**E.  PROPERTY LOSS CONDITIONS**

. . .

**8.  Vacancy**

    **a.  Description of Terms**

        (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs. (a) and (b) below;

. . .

        (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

            (i)    Rented to a lessee or sublessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

    (ii)  Used by the building owner to conduct customary operations.

   (2) Buildings under construction or renovation are not considered vacant.

  **b.** **Vacancy Provisions**

   If the building where physical loss or physical damage occurs has been vacant for more than 60 consecutive days before that physical loss or physical damage occurs:

   (1) We will not pay for any physical loss or physical damage caused by any of the following even if they are Covered Causes of Loss:

    (a) Vandalism;

    (b) Sprinkler leakage, unless you had protected the system against freezing;

    (c) Building glass breakage;

    (d) Water damage;

    (e) Theft; or

    (f) Attempted theft.

ECF No. 19 at 2–4 (quoting Ins. pol'y, ECF No. 20-1 at 33–34, 51, 54–55). AAAA paid all premiums under the policy. ECF No. 19 at 4. Under the vacancy provision of the property loss conditions, the policy does not provide definitions for "customary operations" or "use," nor does it provide any information regarding how the usage of the square footage of the property is to be calculated. *Id.* It also does not provide definitions for "under construction" or "renovation," and Twin City did not provide any such definitions to AAAA after the contract was signed. *Id.* In years prior, AAAA leased the property to several businesses before leaving the property empty from May 16, 2023, through July 31, 2023. *Id.* at 5.

On July 14, 2023, New Antioch Christian Fellowship signed a lease agreement with an effective lease term of August 1, 2023, through July 30, 2028. *Id.* Before signing, Antioch took videos of the property. *Id.* In the lease agreement, Antioch expressly agreed it would be responsible for all repairs and that "all work to building needs to be submitted to landlord for approval." *Id.* The agreement also discounted the first three months' rent "to compensate for tenant improvements." *Id.* at 6. After receiving keys to the property on August 1, 2023, Antioch "obtained various estimates for certain improvements or renovations to be performed at the Property in conjunction with its tenancy" and received a construction proposal dated August 17, 2023. *Id.* "No evidence has been disclosed in this case indicating that Antioch purchased any of the[se] materials or services . . . ." *Id.*

On August 18, 2023, Antioch took over the NV Energy account for electricity on the property. *Id.* "Beginning August 1, 2023, Antioch worked to clean, maintain, and organize the Property for their use" and "[i]n early August 2023, Antioch informed AAAA of inadequate cooling inside the Property." *Id.* On September 7, 2023, Oahu Air LLC performed maintenance on air conditioning units on the building's roof. *Id.* On October 3, 2023, Antioch's Rona Jones reported two instances of theft and vandalism to the Las Vegas Metropolitan Police stating that "[o]n September 7, 2023, the property was broken into and damaged" and "[a]ccording to the police report, the back door was open and there was a hole in the roof. Upon further inspection, Antioch discovered the electrical system where NV Energy meters are located had been cut and wires taken, and that four AC units were stolen." *Id.* at 7. Moreover, the incident report stated that on September 21, 2023, Jones "'discovered spray paint on the windows, the ceiling tiles were broken, and wire hanging from the ceiling'" and "'there were holes in the wall, the back door was kicked in . . . [and] she noticed that there were clothing, food, blankets and other items that does [sic] not belong to her or the business and believes that this is from squatters/homeless individuals.'" *Id.* (quoting LVMPD report, ECF No. 20-17 at 3) (alterations made in brief).

"As a non-profit organization, Antioch was required to seek approval from its board members before committing to any proposals" but there is neither evidence the Antioch board approved any proposal nor is there any evidence that Antioch submitted proposed improvements to AAAA as was required in their lease. *Id.* There were also no building permits issued with respect to the property from August 1, 2023, to October 31, 2023. *Id.* AAAA submitted a claim to Twin City and after Twin City's investigation, it denied coverage "because it determined that the Property had been vacant for more the 60 consecutive days immediately prior to the" incidents. *Id.* at 7–8.

In AAAA's motion for summary judgment, they note that Twin City's denial of coverage letter quoted from the parties' contract but left out provision E.8(a)(2), which states that "[b]uildings under construction or renovation are not considered vacant." ECF No. 22 at 6 (citing ECF No. 20-1 and ECF No. 20-3). In response to AAAA's letter pointing this out and stating that the property was under renovation at the time of the incidents, Twin City stated: "[w]e received your letter written on November 7, 2023. There is no proof of charges paid for the tenant remodeling. Please provide us with contractor invoices to show the completed work. Once we receive proof of the remodeling work then we can further review this matter." Nov. 13 letter, ECF No. 20-3 at 4. AAAA responded questioning why Twin City used these criteria and why it was not included in the contract. Nov. 29 letter, ECF No. 20-3 at 5–6. In response, Twin City stated that "[t]he building was made vacant when the prior tenants moved out in June 2022." Dec. 5 letter, ECF No. 20-3 at 8. It also stated:

> When comparing the photos provided before the event and after the event, no changes were observed to the interior or exterior of the building. We will stand by our position until evidence can be provided that the building was in fact being actively renovated or in use at the time of the loss. You claimed to have attached correspondence in your November 7, 2023 letter but no correspondence was attached to the letter or email. The only correspondence that we have received regarding renovations is in telephone conversations with our insured claiming that renovations were being scheduled and estimates were being requested for renovations by the leasee. We have not been provided copies or proof of these estimates or proof that renovations were underway. The act of obtaining estimates

for renovations does not override the vacancy provision in the policy. The renovations need to be actively underway for the building to be considered not vacant.

*Id.*

## II.    Legal standard

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). At the summary-judgment stage, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed; the case must then proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323. "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

III.    **Discussion**

AAAA argues that several portions of the insurance contract are ambiguous. First, it asserts that "under construction or renovation" is not defined by the contract, and Twin City's various stated requirements for measuring this: "charges paid for the tenant remodeling[,]" "contractor invoices to show the completed work[,]" "changes . . . to the interior or exterior of the building[,]" and "renovations need to be actively under way for the building to be considered not vacant[,]" are not consistent with case law requiring that the court construe the contract either in a manner most favorable to the insures or based on its plain meaning.[4] ECF No. 22 at 10–12. It further contends that "vacancy," which is not clearly defined under the contract, would logically not include a property leased to a tenant in control of the keys and the space. *Id.* at 13. Further, AAAA argues that "at least 31% of its total square footage is . . . [u]sed by the building owner to conduct customary operations," does not include a definition of "use," but AAAA, as the owner, was "engaged in the business of leasing the building, meaning the only operations they conduct are showing the building and leasing the entire building[,]" which was 100% leased at the time. *Id.*

In response, Twin City largely sets out its own summary judgment argument, going so far at times to argue that, regarding the alleged unambiguity of the vacancy condition, "it applies to bar coverage for Plaintiff's claim as a matter of law." ECF No. 24 at 10. It argues first that the contract is unambiguous, even if there are multiple potential interpretations of some of its elements. *Id.* at 8. It asserts that neither Twin City's post-claim correspondence nor its alleged failure to inform AAAA of the vacancy provision have any bearing on the contract's language and plain meaning. *Id.* at 8–11. Regarding vacancy, Twin City cites a slew of state court and out-of-

---

[4] I note that the language AAAA is purportedly quoting in its motion is not the same as the language as it is written in the exhibits. *Compare* Mot., ECF No. 22 at 12 ("under construction or repair[,]" "changes . . . to the interior or exterior of the property[,]" and "renovations need to be ***actively under way*** for the building to be considered not vacant"), *with* Ins. pol'y, ECF No. 20-1 at 55 ("under construction or renovation"), Letters, ECF No. 20-3 at 8 ("changes . . . to the interior or exterior of the building[,]" and "renovations need to be actively underway for the building to be considered not vacant." (no emphasis included on the latter)).

circuit federal cases to support that merely leasing a space does not amount to "customary operations" and "there can be no genuine dispute that neither Antioch nor Plaintiff was using the Property to conduct customary operations during the 60-day period preceding the incidents. At most, Antioch was planning and preparing for improvements to the Property that would make it suitable for Antioch's intended use." *Id.* at 14. Further, Twin City contends that the "under construction" exception to the vacancy policy does not apply here because there were not "substantial improvements or modifications to an existing structure" like "projects that transform a hovel into a mansion, raze and replace the entire interior of a structure, or otherwise fundamentally transform a building." *Id.* (quoting *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 477–78 (Cal. 2006)). Twin City asserts that because Antioch had not acquired any permits or begun any of the projects for which it received proposals, there was not substantial continuing activity for which "the risk of loss becomes roughly equivalent to that of an occupied building, thus giving the insurer the benefit of its prior risk assessment." *Id.* at 15–17 (quoting *TRB*, 145 P.3d at 478).

In its reply, AAAA quotes *National Union Fire Ins. Co. v. Reno's Executive Air*, in which the Supreme Court of Nevada held that "[w]hen a policy has been issued which purportedly provides coverage but whose exclusionary provisions as interpreted by the insurer would narrow the coverage to defeat the purpose of the insurance, the policy must be construed against the insurer." ECF No. 27 at 2–3 (quoting 682 P.2d 1380, 1384 (Nev. 1984)). "Such an exclusion must be stated clearly and unambiguously so as to readily communicate to the insured the specific circumstances under which he or she will not receive the expected coverage." *Id.* (quoting *Nat'l Union Fire*, 682 P.2 at 1384). It implies the term "construction or renovation" is overly technical[5] and that it is therefore ambiguous. ECF No. 27 at 3. However, AAAA also asserts that there "is nothing in the policy that would indicate that $2,000.00 of repairs done to

---

[5] I note that this is a far cry from AAAA's questionable argument of those same words as "so complex and poorly defined that they require substantial legal expertise to even begin to interpret" in its response to Twin City's motion for summary judgment. *See* ECF No. 25 at 6.

the Air Conditioning Units the very day or days leading up to the vandalism would somehow not be considered to be part of 'renovation.'" *Id.* at 4. It distinguishes *TRB* by asserting there was no tenant with a lease as there is here, and quotes from the case saying that if the plaintiff could have established there was a continuous stream of people during business hours prior to the loss, it might raise a genuine dispute of material fact. *Id.* at 5 (quoting *TRB*, 145 P.3d at 479). It also argues that another case cited by Twin City, *Sandlor Properties, Inc. v. AmGUARD Insurance Company*, out of the Central District of California, is inapposite because although the court found there was not a continuous presence at the property, it involved only a few site visits scattered over multiple months. *Id.* at 5–6 (citing 2024 WL 5469545, at *7 (C.D. Cal. Dec. 30, 2024).

As stated, Twin City's motion for summary judgment makes roughly the same arguments that its response to AAAA's motion includes. *Compare* ECF No. 23, *with* ECF No. 24. In response, among other arguments raised in the briefing of its own motion, AAAA asserts that, at a minimum, twelve people visited the property over the alleged six-week vacancy period. ECF No. 25 at 8 (citing Antioch lease agreement, ECF No. 20-9; Antioch correspondence, ECF No. 20-12; Improvement estimates, ECF No. 20-13; LM constr. proposal, ECF No. 20-14; NV energy bills, ECF No. 20-15; Oahu Air invoice, ECF No. 20-16; LVMPD case report, ECF No. 20-17). However, AAAA claims that some visitors made repeated visits, and the space was occupied more than sporadically. *Id.* (citing ECF No. 20-12). In its reply, Twin City argues extensively that the contract is not ambiguous, then once again cites to *TRB* and *Sandlor* in support of its argument that no construction was taking place. *See* ECF No. 26.

First, I find that none of the disputed provisions of the contract are ambiguous. "To determine whether a term is ambiguous, it should not be viewed standing alone, but rather in conjunction with the policy as a whole 'in order to give a reasonable and harmonious meaning and effect to all its provisions.'" *Fourth St. Place, LLC v. Travelers Indem. Co.*, 270 P.3d 1235, 1239 (Nev. 2011) *as modified on reh'g* (May 23, 2012) (quoting *Nat'l Union Fire*, 682 P.2d at 1383). If the policy's language is unambiguous, the court must "interpret it according to the plain meaning of its

terms." *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 616 (Nev. 2014) (en banc). A policy is considered ambiguous if "it creates multiple reasonable expectations of coverage as drafted." *Id.* (simplified).

Starting with "vacancy" and "customary operations," I do not find these terms as written in the contract to be ambiguous. Although the parties disagree as to their meaning, parties' disagreement does not automatically make a contract provision ambiguous. *See Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013) ("[A]mbiguity does not arise simply because the parties disagree on how to interpret their contract."). Vacancy in the contract is given a specific definition: a building is vacant "unless at least 31% of its total square footage is: . . . Rented to a lessee or sublessee and used by the lessee or sub-lessee to conduct its customary operations; and/or . . . Used by the building owner to conduct customary operations." ECF No. 20-1 at 55.

The parties disagree about the exact meaning of "and/or" and about whether leasing a space constitutes "customary operations." In this case, the "and/or" is unambiguous, and the plain meaning of the statement is that property is (1) rented to a lessee or sublessee, (2) used by the owner, or (3) both. As it so happens, at the time of the incidents for which the plaintiff sought insurance coverage, the plaintiff was leasing the property to Antioch. Therefore, the "and/or" allows for three scenarios that would result in the property not being vacant: either Antioch was using at least 31% of the covered space, AAAA was using at least 31% of the covered space, or Antioch and AAAA were, together, using at least 31% of the space to conduct customary operations.

The Second Circuit, looking at the same language, defined "customary" as "commonly practiced, used, or observed." *Keren Habinyon Hachudosh D'Rabeinu Yoel v. Phila. Indem. Ins. Co.*, 462 F. App'x 70, 72–73 (2nd Cir. 2012) (citing Webster's Dictionary). The contract itself lists "Automobile Services Occupancy" as the description of business—presumably because it was signed shortly before AAAA's short-lived agreement with Nevada Tire LLC. ECF No. 20-1 at 19.

That the building would be used as a church by Antioch instead of an automobile services business is not an issue raised or discussed by either party in their motions.

The policy undergirding the vacancy provision is that "unoccupied properties face an increased risk of damage, whether from property-related crime such as theft or vandalism from building damage or loss related to neglect." *TRB*, 145 P.3d at 474. In *Oakdale Mall Assoc. v. Cincinnati Ins. Co.*, looking at a nearly identical vacancy provision, the Eighth Circuit was faced with an identical argument to AAAA's. 702 F.3d 1119, 1125 (8th Cir. 2013). As the court explained:

> We again reject [the mall's] strained interpretation of the policy. Not only is [the mall's] interpretation contrary to the purpose of the vacancy provision, it also creates a conflict between the first and second clauses of that provision. The first clause has two parts: (1) the space be rented to a lessee or sub-lessee, and (2) the space be "used by them to conduct their customary operations." The second clause includes the space used in [the mall's] customary operations as occupied.
>
> [The mall's] interpretation of the second clause—a valid lease satisfies the vacancy provision because leasing space is [the mall's] customary operation—would render the requirements in the first clause—the space be both rented and used by the tenant to be occupied—without effect. [The mall's] interpretation of the vacancy provision is unreasonable, and the district court did not err in rejecting it. *See Mut. Serv. Cas. Ins. Co. v. Wilson Twp.*, 603 N.W.2d 151, 153 (Minn. Ct. App. 1999) ("If a phrase is subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control and no ambiguity exists.")

*Id.* Like the *Oakdale Mall* court, I find that AAAA's assertion that by leasing the property it was conducting customary operations is an unreasonable interpretation of the parties' contract. Thus, I do not find that the contract's "conducting customary operations" language is ambiguous. *See Granite Constr. Co. v. Remote Energy Sols., LLC*, 403 P.3d 683, at *1 (Nev. 2017) ("A contract is ambiguous if it is *reasonably* susceptible to more than one interpretation." (quoting *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003) but adding emphasis)).

Under this provision, I grant summary judgment to Twin City on the initial issue of vacancy—separate from my analysis of the "under construction or renovation" provision. At the time of the incidents at the heart of AAAA's insurance claims, even in the light most favorable to

AAAA, 31% or more of the property, a retail or other public space, was not being used to "conduct[ ] customary operations" by either AAAA, Antioch, or both: the parties agree that the space was not being used for automotive services, church, or any other commercial or ecclesiastical purposes for more than sixty days prior to the incidents.

Regarding the "buildings under construction or renovation" provision, I find that this is also unambiguous. The *TRB* decision, though not controlling, provides a detailed and helpful outline for the meaning of "under construction" in similar contracts. According to the California Supreme Court, "under construction" can mean more than just the "building of a new structure" but can include "preparatory" activities for future construction or "substantial improvements or modifications to an existing structure" like "projects that transform a hovel into a mansion, raze and replace the entire interior of a structure, or otherwise fundamentally transform a building." *TRB*, 145 P.3d at 473, 477–78. As it explained, "[i]f a building is regularly occupied during normal business hours, as is usually contemplated for commercial structures, then an insurer can assess risk . . . . When there is substantial construction activity on the premises, the risk of loss becomes roughly equivalent to that of an occupied building, thus giving the insurer the benefit of its prior risk assessment." *Id.* at 478. Thus, "the proper inquiry for determining whether a building is 'under construction' for purposes of defining an exception to the vacancy exclusion is whether the building project, however characterized, results in 'substantial continuing activities' by persons associated with the project at the premises during the relevant time period." *Id.* (quoting *Will Realty Corp. v. Transportation Ins. Co.*, 492 N.E.2d 372, 373 (Mass. 1986) and citing *Vennemann v. Badger Mut. Ins. Co.* 334 F.3d 772, 774 (8th Cir. 2003)). The court contrasted "substantial continuing activities" from "sporadic entry" and stated that it "believe[d] this test better serves the purposes underlying the vacancy exclusion and more accurately reflects the reasonable expectations of an insured than any test turning upon technical distinctions between 'construction' on one hand and 'renovation' or 'remodeling' on the other." *Id.* at 478–79.

Finding no Nevada case law that rejects this interpretation or adopts a different one, either in the parties' briefing or from an independent search, I find that the same logic applies to this contract as the one in *TRB* and therefore utilize this same test. *See Wynn Resorts, Ltd. v. Factory Mut. Ins. Co.*, 2023 WL 5319772, at *3 (D. Nev. Aug. 10, 2023) ("[I]nterpreting insurance policy terms, [this court] has often looked to persuasive precedent from other jurisdictions, especially California." (internal quotation omitted)). Thus, there is no ambiguity: if AAAA can prove that there were substantial continuing activities on the property, as opposed to only sporadic activity, the exception to the vacancy provision applies.

With the briefing before me, I am unable to grant summary judgment to either party on this issue. AAAA asserts that there were "at a ***minimum***, 12 people visited the property over a 6-week period." ECF No. 25 at 8 (citing several exhibits showing that multiple permits were obtained and air conditioning units were repaired). Likewise, on the day of the September incident, a person from Oahu Air was present on the property conducting repairs. *Id.*; ECF No. 19 at 6. None of this proves conclusively that these visits amounted to substantial continuing activity, as even repeated visits from twelve people over multiple weeks does not necessarily assuage the concerns of a property appearing vacant to the public. But I also am unable to conclude that the property *did* appear vacant; improvements were being made to the property's air conditioning systems and multiple projects were simultaneously being initiated—even if the contracts had not been signed at the time. Twin City cites repeatedly to *Sandlor*, but there, the court found that "two to four workers visited the site each week" and several "site meetings and visits, scattered throughout the months leading up to the Incident, constitute sporadic activity." 2024 WL 5469545, at *7. Although it appears entirely possible that the activity here resembled that in *Sandlor*, reading the evidence in the light most favorable to AAAA, this remains a genuine dispute of material fact. Thus, I cannot grant summary judgment to either party as to whether the "under construction or renovation" exception applies.

**IV.    Conclusion**

IT IS HEREBY ORDERED that the parties' stipulation of undisputed facts **[ECF No. 19] is APPROVED**.

IT IS FURTHER ORDERED that plaintiff AAAA Investments' motion for partial summary judgment **[ECF No. 22] is DENIED.**

IT IS FURTHER ORDERED that defendant Twin City Fire Insurance Company's motion for summary judgment **[ECF No. 23] is GRANTED in part and DENIED in part**, as set out in this order.

This matter is referred to the magistrate judge for settlement. LR 16-5. If the parties are unable to reach an agreement, they must file a proposed joint pretrial order within thirty days of the failed settlement negotiations.

Dated: August 18, 2025

_____
Cristina D. Silva
United States District Judge